No. 2630.

D. TINNEY v. THE STATE.

1. THEFT—POSSESSION—INDICTMENT.—"Actual care, control and management" of the alleged stolen property is, under our statute defining theft, such possession as will support an allegation of possession.
2. SAME—CONSTRUCTIVE POSSESSION—VARIANCE.—The indictment in this case alleged both the ownership and possession in D. The proof showed that, though the animal belonged to D., one H. found it on his premises, took it up, and staked and fed it on his premises, and proclaimed his intention to estray it. But, before H. could complete the estrayal of the said animal, it was stolen from the stake on his premises. *Held*, that the proof shows that H. had the "care, control and management" of the horse, which constituted possession; and therefore the variance between the allegation and proof of possession is fatal to the conviction.

APPEAL from the District Court of Gonzales. Tried below before the Hon. George McCormick.

This conviction was for the theft of a horse, the indictment alleging the ownership and possession to be in M. C. Doyal. The penalty awarded was a term of six years in the penitentiary.

M. C. Doyal was the first witness for the State. He testified, in substance, that he lived near the town of Harwood, in Gonzales county, Texas, and was the owner of the horse alleged in the indictment to have been stolen on or about July 17, 1886. The said horse was taken, without the knowledge or consent of the witness, from the range near Harwood in said Gonzales county, about the time alleged in the indictment. Witness saw the said horse at his house on the day before he was taken, and he recovered him about three weeks later from Doctor W. T. Jones, at the town of Hockheim, in DeWitt county, about thirty miles from witness's house. The horse referred to was an iron gray animal, blind of one eye, about fourteen and a half hands high, and branded and counterbranded HS on the left shoulder. A half circle X, the half circle being below the X, was branded on the same shoulder above the HS, and the letter F was branded on the left jaw. The horse was a gentle, well broken saddle and work horse, and was between six and seven years old.

Cross examined, the witness said that he lived about a mile from the Gonzales and Caldwell county line. The horse ran upon the open range, generally in Gonzales, but sometimes in Caldwell county. Witness searched for the said horse throughout several days next succeeding his disappearance from the range. When he disappeared, the said horse had a collar and bell on his neck, which collar and bell the witness, about a week after his horse disappeared, recovered from Mr. Hurst, who lived in Caldwell county, ten or twelve miles from witness's house. Hurst lived two or three miles nearer the witness than did the defendant's father.

Doctor W. T. Jones was the next witness for the State. He testified, in substance, that he lived in the town of Hockheim, DeWitt county, Texas. He identified the defendant as the man who, at Hockheim, on July 24, 1886, sold him the horse mentioned in the indictment, and described in the testimony of the witness Doyal. Defendant, whom witness had never seen prior to the said July 24, rode up to witness's house from the pasture, about sunrise, and offered to sell or trade the horse. He then told witness that his name was Joe Fuller, or perhaps, he said Fulton. Witness traded an injured horse and ten dollars in money for the iron gray horse. In reply to witness's questions about the horse, the defendant said that he got the animal from one Thompson, near Thompsonville, on Sandy Fork; that he had known the animal a long time, and knew him to be a gentle, trustworthy saddle and work horse. After the trade, the defendant remarked that he had intended to go down the country, but, as he had got a lame horse in the trade, he would return home and put the said horse in a pasture. He took breakfast with witness and then left, taking the Gonzales and Cuero road towards Gonzales. Two or three weeks later the witness read the description of the iron gray horse in the sheriff's department of the Galveston News. He immediately wrote to Sheriff Jones, of Gonzales county, that he had the horse. A few days later, Mr. M. C. Doyal arrived at witness's house and proved the horse.

W. E. Jones, sheriff of Gonzales county, was the next witness for the State. He testified, in substance, that he knew the defendant to be D. Tinney. On hearing of the theft of Doyal's horse, the witness advertised the theft in the Galveston News. A few weeks later he received a letter from Doctor W. T. Jones, of Hockheim, and notified Mr. Doyal. The witness then arrested defendant for the theft of Doyal's horse. During the defendant's

8

confinement in jail, the witness interviewed him for the purpose of finding out, if he could, what disposition defendant had made of the horse he got from Doctor Jones. Witness warned the defendant that whatever statement he might make could and would be used against, but not for him. He offered defendant no inducement to make any statement, nor did he promise or threaten defendant in connection with any statement. Defendant said in that conversation that he got the Doyal horse from a man at Mrs. Warren's near Thompsonville, and that Walter Warren was present at the time. He did not mention the name of the man from whom he claimed to have got the Doyal horse, but said that he rode that horse through the town of Gonzales, crossed the Guadalupe river on the iron bridge, whence he went down by Hamons's and recrossed the Guadalupe river near Hockheim. Upon information received from the defendant, the witness recovered the W. T. Jones horse. Witness had never known a man in Gonzales county named Walter Ward.

Walter Warren testified, for the State, that he had known the defendant for several years. His name was D. Tinney, and he lived on Tinney's creek, in Caldwell county, Texas. Witness lived with his mother on Sandy Fork, near Thompsonville, in Gonzales county, Texas. The defendant, riding a small paint mare, came to witness's mother's house about night on July 22, 1886. He sold that mare to witness's brother for twenty-three dollars on credit. He hung his bridle and saddle on the fence, and ate supper at witness's house. After supper witness told defendant that he was going to Bullard's house, a mile distant, to spend the night. Defendant replied that he would go, too. Before reaching Bullard's, defendant left witness, saying that he wanted to go to McCoy's house, and witness never saw him afterwards until after his arrest. Witness went to school next day with the Bullard boys, and when he got home from school the defendant's bridle and saddle had disappeared. Witness did not know by whom nor when the said bridle and saddle were taken away from the fence. The witness never saw the defendant at any time or place, trade for an iron gray or any other kind of horse. Defendant had no other animal than the paint mare when he came to witness's house on the said July 22 that the witness saw. The witness had never known nor heard of a man named Walter Ward in either Gonzales or Wharton county, where witness now lives. Mr. W. H. Ham was at the house of

the witness's mother when defendant came there and sold the paint mare to witness's brother.

Cross examined, the witness said that before the defendant separated from him at the forks of the road and went toward McCoy's, he asked witness about Adam McCoy, and said that he wanted to see him. Adam McCoy left Gonzales county in the summer of 1886, and witness had not seen him since. Witness was not absolutely certain that it was on the evening of July 22 that defendant came to his mother's house, but knew it was late in July, 1886.

W. H. Ham testified, for the State, that he was constable of precinct number four in Gonzales county. Witness spent the night of July 22, 1886, at the house of Mrs. Warren, near Thompsonville. He found the defendant there that night. At about ten o'clock Walter Warren remarked that he was going to Bullard's to stay all night. Defendant replied that he would go with him. Defendant and Walter left, and witness saw no more of defendant. On the next morning the witness went to Waelder, accompanied by Ed Warren, Walter's brother, who rode a small paint mare. Witness knew it was the night of July 22, 1886, when he saw defendant at Mrs. Warren's. He knew by referring to his return on a search warrant which he executed on a negro's house the night before. Witness was born and reared in Gonzales county, near Thompsonville, and knew all the people in that section. No such man as Walter Ward ever lived in Gonzales county. Adam McCoy was the son of John McCoy, who lived about a mile from Mrs. Warren. Adam is now a refugee from justice, and has not been in Gonzales county since the summer of 1886.

The State next introduced in evidence the defendant's sworn application for an attachment to Wharton county for Walter Ward. The said application recited that the said Walter Ward was a resident of Gonzales county, but was temporarily absent in Wharton county, and that defendant expected to prove by him that he, defendant, purchased the alleged stolen horse in a fair and open market, and paid a valuable consideration for the same. The State also introduced, in evidence, the attachments issued upon the defendant's application for the said Walter Ward, and then issued to defendant for Walter Warren, Ed Warren and Adam McCoy. The State then rested.

John B. Cole was the first witness for the defense. He testified that he lived on Tinney's creek, in Caldwell county. He had

known the defendant for several years, during which time the defendant's reputation for honesty was good. On the third Sunday in July, 1886, the witness was on the Harwood and Lockhart road, when he saw a one eyed iron gray horse, branded with a half circle X, traveling said road, going from the direction of Harwood towards Lockhart. Thinking that the horse had escaped from some one at a neighboring camp meeting, witness stopped and detained him for some time. No one coming up to claim the said horse, witness released him, and he trotted off up the road. The witness could not say that the horse he saw and stopped on the road was the Doyal horse.

L. O. West testified, for the defense, that he lived on Tinney's Creek, in Caldwell county, about a mile from old man Tinney's. He had known defendant for many years, during which time defendant's reputation for honesty was good. About July 18, 1886, the witness observed a one eyed iron gray horse, branded half circle X, and something else, and wearing a collar and bell, about his place. That animal remained among witness's horses for several days and disappeared. Since then, witness had not seen him. Witness was related to the defendant.

James Cole testified that he was at Ellis's store, on Tinney's creek, in Caldwell county, on the evening of July 21, 1886. While he was there, J. W. Hurst rode up on a flea bitten gray horse. Hurst said that he "pulled" the said horse. Witness had known the defendant always, but knew nothing about his reputation. The witness was related to defendant.

On his cross examination, this witness said that defendant was at Ellis's store at the same time Hurst was, and left the store with Hurst, riding a small paint mare. Witness did not see the defendant again for ten or twelve days, and did not know where he was during that time. When Hurst said that he "pulled" the horse, he was talking to a crowd, and spoke in a jocular and laughing manner. The gray horse was then hitched to a rack in full view of all the parties at the store.

D. L. Ellis, the defendant's brother-in-law, and proprietor of the store referred to by James Cole, testified, for the defense, that, on the evening of July 21, 1886, J. W. Hurst rode an iron gray horse up to his store. Witness had been trying to sell Hurst a horse, and when he saw him with the gray horse he concluded that he had got him one. As Hurst entered the store the witness asked him where he got the gray horse. He replied that he bought the horse and paid forty dollars for him. That

horse was branded HS. Witness remembered seeing no other brand on him.

On his cross examination, this witness said that Hurst hitched the said horse in front of the store in full view of the crowd then assembled there. Defendant was at the store at the time, but witness did not see him again for ten or twelve days. On the next day Hurst passed the store, going toward Lockhart, and said that the gray horse had been stolen during the night. Witness was present at the defendant's examining trial, but did not testify. He went on defendant's bond, and was still on it.

G. Tinney, the defendant's father, was the next witness for the defense. He testified that the defendant was twenty-two years old at the time of this trial. When he was sixteen years old he left the witness's house and spent about two years in Guadalupe and Hardin counties. While he lived in Guadalupe county he went by the name of Joe Fuller. Since his return to Caldwell county he had lived with witness and D. L. Ellis, his brother-in-law.

On his cross examination, this witness said that when the defendant left home, as stated, he left without witness's consent, and, without his consent, took one of his horses. He left that horse in Guadalupe county, where witness got him. Defendant, previous to his departure, used that horse whenever he wanted to. Witness did not know what business defendant engaged in during his absence from home. Witness had never seen the gray horse involved in this prosecution.

L. O. West, recalled by the defendant, testified that, since his previous testimony he had examined the so called Doyal horse, and recognized him as the horse he saw with his horses in July, 1886. He now remembered that defendant once left home with one of his father's horses, which he left in Guadalupe county. That circumstance had escaped the witness's memory when he testified respecting the defendant's character. J. B. Cole was also recalled, and, in like manner, identified the Doyal horse as the horse he met in the road, and recalled to his recollection the defendant's unauthorized journey to Guadalupe county with one of his father's horses.

The defense closed.

J. W. Hurst testified, for the State, that he lived on Tinney's creek, in Caldwell county, Texas, and knew the defendant. On the twenty-first day of July, 1886, the horse mentioned in the indictment, and described in the testimony of the witness Doyal,

came to the witness's house. He then had a bell on. Witness took the horse up and rode him to the house of a neighbor to see if said neighbor knew who owned him. Witness then rode the said horse to Ellis's store, where he met J. M. Jones, of whom he asked if a certain person did not own the said horse. Jones replied in the negative. The witness then related the circumstances attending the taking up of the horse. A large crowd was assembled at the store, and witness hitched the horse in full view of the said crowd. When witness ascertained that no one at the store knew who owned the horse, he bought pens, ink and paper with which to write out estray notices of the horse. Defendant came to the store, examined the horse, and stood for a while with his foot in one of the stirrups of the saddle. Witness told the defendant about taking the horse up. Witness left the store about sundown. He was soon overtaken by defendant, who rode along with him. In the course of the conversation about the horse which ensued, the defendant said: "If I were you I would get away with him." Witness replied that he would not do that for a caballado of horses. Defendant soon left witness, and witness did not see him again for ten or twelve days. After he reached home on that night, the witness staked the said horse in his field and gave him a bundle of oats. The horse was taken from that field during the night. On the next morning the witness found where the fence had been let down for the horse to pass out. He tracked the horse a short distance in a southeast direction, but soon lost the trail. Witness then went to the Ellis store and told the parties he found there about the disappearance of the horse, and rode on to Lockhart and reported the loss of the horse to the sheriff, with a description of the animal to be published in the Galveston News. Within a day or two witness learned that M. C. Doyal, of Gonzales county, had lost a horse answering the description of the one taken from witness's field. He wrote Doyal an account of his connection with the animal, and in a few days Doyal came to his house, and he gave Doyal the collar and bell he had taken from the horse. The horse had been in witness's actual, manual possession about five hours when witness rode him to Ellis's store.

Cross examined, the witness said that he may have said to J. B. Cole, that he "pulled" the horse. He had no recollection of saying to Ellis that he bought the horse, and did not believe he said any such thing.

M. C. Doyal, recalled by the State, testified that he went to

Hurst's house in response to a letter he received from Hurst concerning his horse. Hurst gave him the collar and bell.

John B. and James B. Cole and L. O. West testified for the State that they had known J. W. Hurst for many years, and that his reputation for honesty had always been good.

The motion for new trial raised the questions discussed in the opinion.

*Ponton & Fly,* for the appellant.

*W. L. Davidson,* Assistant Attorney General, for the State.

WHITE, PRESIDING JUDGE. It was alleged in the indictment that the stolen horse belonged to and was taken from the possession of one M. C. Doyal. It was proven that Doyal was the owner of the horse; that it left his premises in Gonzales county, and strayed off with a bell upon it on the seventeenth of July; was seen in Caldwell county on the eighteenth, some twelve miles from home. On the twenty-first it was taken up by one Hurst, who, after making inquiry for the owner and failing to find him, took the horse to his home, intending to estray him, and there staked him out in his field and also fed him. That night the horse was taken from Hurst's field, and the next seen of him he was in possession of defendant on the twenty-fourth, in the county of De Witt, where he, defendant, sold him to one Jones.

On this state of facts it is insisted there was and is a fatal variance between the allegation and proof as to the party from whose possession the animal was taken. In a word, it is urgently claimed that the animal was stolen from the possession of Hurst and not of Doyal. If Hurst had simply found the animal an estray upon his premises, and, without taking actual manual possession and control of him, had only taken steps to estray him, it seems that until he had complied fully with the laws regulating estrays, such constructive possession would not have conferred upon him a sufficient special ownership to justify an allegation that he was the owner in possession, should the animal have been stolen from him. (Blackburn v. The State, 44 Texas, 457; Lowe v. The State, 11 Texas Ct. App., 253.) If, however, he had complied with the laws regulating estrays, then, indeed, he would have had such special property as would support an allegation of ownership in him. (Cox v. The State,

43 Texas, 101; Jinks v. The State, 3 Texas Ct. App., 68.) His intention was to estray the horse, but before he had time to do so, it was stolen from him. When stolen it was in his "actual care, control and management," for he had it staked out in his field where he had fed it. "Actual care, control and management" is expressly declared by our law to constitute the "possession" contemplated in our statute of theft. (Penal Code, arts. 724, 729; Code Crim. Proc., art. 426; Bailey v. The State, 18 Texas Ct. App., 427; Frazier v. The State, 18 Texas Ct. App., 434; Littleton v. The State, 20 Texas Ct. App., 168.

In Blackburn's case, 44 Texas, 462, Roberts, Chief Justice, says: "If a person has taken actual control, and is in the full possession of a horse so as to be responsible to the true owner for the disposition of it, and the horse is taken out of his possession by one having no right or authority, it is a trespass as against the temporary possessor, and, if taken with intent to steal, the indictment may allege the horse to be the property of the person from whose possession it was taken. Hence it was held that when a horse got loose from his owner, and was taken in the field of a third person and placed in his stable, from whence he was stolen, it might be alleged to be the property of such third person who had the actual possession." (Citing Wharton's Crim. Law, sec. 1830; Owen v. The State, 6 Humphrey, 330.)

In Littleton's case, 20 Texas Court of Appeals, 174, Judge Hurt pertinently and forcibly says: "The indictment must allege that he (defendant) took the property from the *possession* of some *person*. This person must be named, and this person must have possession, actual or constructive, of the property at the time it is taken. If his relation to the property is rendered closer or nearer than that of the real owner, by reason of the fact that he is in actual care, control or management of the same, then, in that case, the person bearing such relation is the proper person in whom to allege possession; in other words, from such person the possession must be alleged to have been taken. Why? Because such person occupying such relation to the property is apparently the real owner, and the rule which requires that the indictment name the owner applies with equal force in the case stated."

We are of opinion that there is a fatal variance between the allegation and proof as to the person from whom this defendant took possession of the horse. At the time he was not in Doyal's, but was actually in the possession, care, management, control

and charge of Hurst. (Bailey v. The State, 20 Texas Ct. App., 68; Briggs v. The State, Id., 106; Hall v. The State, 22 Texas Ct. App., 632.)

Appellant requested an appropriate instruction upon this point, which was refused.

The judgment is reversed and the cause is remanded.

*Reversed and remanded.*

Opinion delivered October 26, 1887.